UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

JOHN LaCOSSE, SR.,

                Plaintiff,                      Case No. 2:10-cv-56

v.                                        Honorable R. Allan Edgar

SUN LIFE FINANCIAL SERVICES
COMPANY, INC., a/k/a SUN LIFE
ASSURANCE COMPANY OF CANADA,

                Defendant.
_____/

**<u>MEMORANDUM</u>**

      This suit arises out of Sun Life Financial Services Company, Inc., a/k/a Sun Life

Assurance Company of Canada ("Sun Life")'s denial of John LaCosse, Sr.'s long term

disability benefits and waiver of life insurance policy.  Complaint, Doc. No. 1.  Both parties

have submitted briefs for judgment on the administrative record for both the benefits denial

and the life insurance waiver denial, and LaCosse has submitted reply briefs on both issues.

The Court has reviewed all of these documents.  In addition, the Court has reviewed the

administrative record, along with Sun Life's supplements to the record and LaCosse's

objection to the supplement of an amended long term disability benefits policy.  The Court

notes that the administrative record was filled with duplicate, and sometimes several, copies

of the same documents, and it has only provided citations to page numbers from one of the

multiple copies in this opinion.  After reviewing the pleadings and the administrative record,

the Court finds that LaCosse's motion for judgment on the pleadings concerning the denial

of long term disability benefits [Doc. No. 18] will be GRANTED and his motion for judgment on the pleadings concerning the denial of his life insurance waiver of premium benefit [Doc. No. 33] will be DENIED. Correspondingly, Sun Life's motion concerning the denial of long term disability benefits [Doc. No. 20] will be DENIED and its motion seeking the denial of the life insurance waiver of premium benefit [Doc. No. 34] will be GRANTED.

I. BACKGROUND

*Relevant Policy Provisions*

The Court begins by resolving a dispute between the parties as to which version of Sun Life's long term disability (LTD) benefits policy is the proper one to consider in this review. A copy of the policy, which states that it was effective on August 1, 2007, was filed as a supplement to the administrative record by Sun Life on July 20, 2010 ("old policy"). A.R., pp. 1350-1424. On September 27, 2010, Sun Life filed a supplement to the administrative record [Doc. No. 17] with a slightly different LTD benefits policy which affects the calculation of LaCosse's monthly disability amount and which also stated that it was effective on August 1, 2007 ("new policy"). A.R., pp. 1432-1752. Apparently this policy was reissued to include changes requested by LaCosse's employer, Engineered Machine Products (EMP), and applied retroactively back to August 1, 2007. A.R., p. 1753.

LaCosse objected to this supplement of the record, arguing that he was given the old policy when his counsel requested the policy at issue from EMP, and stating that it would be "unfair and prejudicial" to allow for the record to be supplemented only a few weeks before LaCosse's LTD brief was due. Doc. No. 16, p. 2. Given the fact, however, that the evidence shows that Sun Life sent the "new" version of the policy to EMP on December 1, 2008, it was EMP, rather than Sun Life, who made the mistake of giving LaCosse the "old"

version of the policy that he requested. A.R., p. 1753. While this apparent error on the part of EMP is regrettable, the Court does not see it as a basis for refusing to allow the record to be supplemented, particularly when the "new" policy was considered by Sun Life in its decisions to deny benefits. LaCosse also notes that the new policy appeared to have been written after the time that LaCosse allegedly became Totally Disabled, and applied retroactively back to August 1, 2007, before his disability date. Doc. No. 16, p. 2. As LaCosse is unable to provide any evidence as to when the policy took effect, his allegation does not have factual support. The Court will therefore allow for the supplementation of the administrative record, and will consider the "new policy" in this *de novo* review.[1] LaCosse's objection to supplementation of record [Doc. No. 16] is therefore rejected.

LaCosse's LTD benefits policy with Sun Life states the following:

> Sun Life will pay a monthly LTD benefit after the end of your Elimination Period, if Sun Life receives proof that you are
> -Totally or Partially Disabled due to an Injury or Sickness; and
> -under the regular and continuing care of a Physician that provides appropriate treatment and regular examination and testing in accordance with your disabling condition.

A.R., p. 1450.

Sun Life defines Total Disability as follows:

> Total Disability or Totally Disabled means during the Elimination Period and the next 24 months, the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation. After Total or Partial Disability benefits combined have been paid for 24 months, the

---

[1] Confusingly, the supplement to the administrative record found on pages 1432-1752 appears to contain two copies of the same amended policy [A.R., pp. 1493-1567 and pp. 1626-1697] and three copies of the same booklet on the policy [A.R., pp. 1437-1492, 1568-1621, and 1698-1752]. As the booklet states that the actual policy will govern if there is a dispute between it and the policy [A.R., p. 1699], the Court will consider the policy only in this review [A.R., pp. 1626-1697, for reference].

> Employee will continue to be Totally Disabled if he is unable to perform with reasonable continuity any Gainful Occupation for which he is or becomes reasonably qualified for by education, training or experience . . . To qualify for benefits, the Employee must satisfy the Elimination Period with the required number of days of Total Disability, Partial Disability or a combination of days of Total and Partial Disability.

A.R., p. 1646.

The LTD policy defines "Elimination Period" as "a period of continuous days of Total or Partial Disability for which no LTD benefit is payable. The Elimination Period is shown in Section I, Schedule of Benefits and begins on the first day of Total or Partial Disability." A.R., p. 1643. LaCosse argues that the Elimination Period in this case is 180 days, and Sun Life states that it is the later of 180 days or the end of the STD Maximum Benefit Period, which it states is 189 days. After reviewing the "new policy," the Court has determined that the correct Elimination Period is actually 182 days, as the "new policy" provides that the Elimination Period is 180 days or the end of the STD Maximum Benefit Period, whichever is later [A.R., p. 1634], and the STD Maximum Benefit Period is 26 weeks. A.R., p. 1633. Since the Elimination Period began on August 4, 2007, it would have ended twenty six weeks (182 days) later, on February 1, 2008.

The policy states that "Material and Substantial Duties means, but is not limited to, the essential tasks, functions, skills or responsibilities required by employers for the performance of the Employee's Own Occupation. Material and Substantial Duties does not include any tasks, functions, skills or responsibilities that could be reasonably modified or omitted from the Employee's Own Occupation." A.R., p. 1644.

The LTD policy defines "Own Occupation" as "the usual and customary employment, business, trade, profession or vocation that the Employee performed as it is generally

4

recognized in the national economy immediately prior to the first date Total or Partial

Disability began." A.R., p. 1645. The policy also notes that "Own Occupation is not limited

to the job or position the Employee performed for the Employer or performed at any specific

location." A.R., p. 1645.

LaCosse's Group Life Insurance policy with Sun Life includes the following Group

Life Insurance Waiver of Premium ("LWOP") benefit:

> If Sun Life receives Notice and Proof of Claim that an Employee
> becomes Totally Disabled:
> -while insured
> -before his 60th birthday; and
> -before his retirement;
> the amount of Life Insurance will continue for that Employee
> from the date of Total Disability without further payment of
> premiums.

A.R., p. 1781. "Totally Disabled for purposes of determining eligibility for Waiver of

Premium, means an Employee, because of Injury or Sickness, is unable to perform the

material and substantial duties of any occupation for which he is or becomes reasonably

qualified for by education, training or experience." A.R., p. 1768.

*Occupational Requirements*

LaCosse first began working at Engineered Machine Products (EMP) in 1991, and

he became a Senior Buyer in 2002. A.R., p. 152. EMP describes the physical requirements

for LaCosse's Senior Buyer position as follows:

> This position involves a substantial amount of travel to vendor
> locations. While performing the duties of this job, the employee
> is regularly required to use hands to finger, handle, or feel and
> talk or hear. The employee frequently is required to sit and
> reach with hands and arms. The employee is occasionally
> required to stand; walk; climb or balance; and stoop, kneel,
> crouch, or crawl. The employee must occasionally lift and/or
> move up to 25 pounds. This is a high stress position.

5

A.R., p. 18.  While there is some indication that LaCosse received special accommodations from EMP to do his job [A.R., pp. 152, 581], those accommodations are not specified in the administrative record, and therefore the Court will view the above description as an accurate portrayal of LaCosse's responsibilities as a Senior Buyer.

Before issuing its initial denial of LTD benefits for LaCosse, Sun Life hired Bruce Hoffman, a vocational rehabilitation consultant, to draft an occupational analysis on LaCosse's Senior Buyer position.  A.R., pp. 153-155.  Hoffman came to the following conclusion:

> Per my review, it is my professional opinion, the Insured's job, as performed with this employer, is not commensurate with the way the occupation is typically performed in the national economy and is not consistent with required physical demands to complete material and substantial duties.  The Insured's job as performed with this employer requires medium physical exertion as defined by the US Dept. of Labor given the reported need to lift and or move up to 25 lbs occasionally.  Therefore, the physical demands of the Insured's job do exceed what is typically required in the national economy to complete material and substantial occupational duties.

A.R., p. 153.  Hoffman went on to state that "the Insured's occupation, as it exists in the national economy, would be most similar to that of a Purchasing Agent[.]" A.R., p. 154.  He stated that the physical demands of a Purchasing Agent, as defined by the Department of Labor, would include light physical exertion, which would consist of carrying, pushing, pulling 20 pounds occasionally, frequently up to 10 pounds, or negligible weight constantly, and which could also include walking or standing frequently, along with occasional reaching, handling and fingering.  A.R., p. 155. When Sun Life made its LTD benefits determination and its appeal determination, it relied on the "Purchasing Agent" duties that Hoffman listed

to determine the "Material and Substantial Duties" of LaCosse's "Own Occupation." A.R., pp. 284, 1008.

*LaCosse's Medical History*

LaCosse was diagnosed with cervical spinal stenosis in February of 2002, when a Dr. Rovin performed a decompressive cervical laminectomy on him. A.R., p. 1306. On May 13, 2002, LaCosse had a stress test because of right and left shoulder discomfort. A.R., p. 786. The results of the test ruled out exercise induced coronary artery ischemia. A.R., pp. 786, 788. On August 7, 2002, a Dr. Rose noted that LaCosse continued to have postoperative cervical spinal stenosis difficulties with weaknesses in the shoulder girdle, arms, and numbness feeling in the left little finger. A.R., p. 789. In early 2005, Dr. Fitch, a treating physician, noted that LaCosse had received steroid injections the previous November for the cervical disc disease. A.R., p. 832. A note by Dr. Fitch on November 22, 2006 stated that LaCosse had complaints of aching shoulders, especially when carrying firewood, a small amount of trouble going up and down stairs, and stiffness in his hands. It also noted that walking typically did not give LaCosse problems. A.R., p. 836. LaCosse also had a chronic history of high blood pressure, hyperlipidemia, an aortic aneurysm and coronary artery disease that was noted as early as 2002, when the records began. A.R., pp. 789, 832.

On May 5, 2007, LaCosse was seen by Dr. Fitch for an irritation in his ear. A.R., p. 173. Dr. Fitch noted during this visit that LaCosse's weight problem was not being managed, and discussed his need to curtail carbohydrate intake. A.R., p. 173.

On June 19, 2007, LaCosse had an office visit with Dr. Fitch for a follow up of his blood pressure. Dr. Fitch stated the following with regard to this visit:

>John has a significant problem with his physical status and work status. Basically he had neck surgery in 2000 and I did not go into all the details of that. Apparently it did give him some physical restrictions. He is now involved in negotiations with his employer because of the problems with EMP down sizing, and having to spread out the work. They are asking him to go back to work that he had done 7 years ago, which would involve more physical work and much more travel with some travel out of country, much more eating out at restaurants, and business dinner meetings. These are all things that he knows will be harmful for his health.

>Consequently, his options probably involve the ideal one, which would be a buy out. He doubts that his employer will go for that. Instead he will probably go for disability. John has a private disability insurance that he bought through the company and that would likely be effective for him. He did show me a list of the duties that he is being asked to do. I told him that he probably needs to take that list and itemize himself what he would be unable to perform in that line. Then we would probably need to fill out a disability form for him.

A.R., p. 839. Dr. Fitch also noted that he was recommending that John increase his blood pressure medication. A.R., p. 839.

On June 29, 2007, LaCosse met with Dr. Fitch for follow up of his blood pressure and regarding his disability. A.R., p. 840. LaCosse complained of muscle stiffness in his arms, which Dr. Fitch suspected was due to his blood pressure medication. A.R., p. 840. Dr. Fitch asked LaCosse to fill out a list of his symptoms to indicate what aspects of his job he would not be able to tolerate. A.R., p. 840.

On July 31, 2007, LaCosse met with Dr. Fitch for another blood pressure follow up, at which time Dr. Fitch noted that LaCosse had switched blood pressure medications and was feeling better with regard to those symptoms. A.R., p. 842. Dr. Fitch also noted that LaCosse was walking regularly, and was getting twinges of chest pain, which Dr. Fitch did not believe indicated "a cardiac thing." A.R., p. 842.

*LaCosse's Medical History After Leaving Sun Life*

LaCosse's last day of work at EMP was on August 3, 2007.  A.R., p. 243.  On that day, he filled out an application for short term disability (STD) benefits.  A.R., pp. 243-248.  Under the section where he was asked to describe the nature of his illness/condition, LaCosse stated "Hypertension, neck, arms, back, leg pain & numbness, aneurysm, cervical surgery - started in 2001.  Nerve condition."  A.R., p. 243.  Dr. Fitch filled out an attending physician statement for LaCosse's STD application.  A.R., p. 246-247.  He stated that LaCosse's disability had commenced on June 29, 2007.  A.R., p. 246.  He checked the physical impairment box of "Class 4 - Moderate limitation; capable of clerical/administrative (sedentary) activity."  A.R., p. 247.  This was a level below "Class 3," which was listed as a "Slight limitation; capable of light work."  A.R., p. 247.  It was a level above "Class 5," which was listed as "Severe limitation; incapable of minimum (sedentary) activity."  A.R., p. 247.

LaCosse was next seen by Dr. Fitch on August 7, 2007 for stomach pain.  A.R., p. 843.  Dr. Fitch noted his impression that LaCosse may be having a problem with constipation and recommended Metamucil, along with a blocker for stomach pain.  A.R., p. 843.  On October 26, 2007, Dr. Fitch saw LaCosse again, and noted that, because of back pain, "any walking gives him a problem."  A.R., p. 849.  Dr. Fitch raised the possibility of sciatica as being a potential cause of the back pain.  A.R., p. 849.

On October 30, 2007, an MRI was done.  A.R., p. 779.  The reading indicated the following:

> 1. Mild right paracentric disc bulge at the L 1-2 level flattens the anterior thecal sac and narrows the AP diameter of the right lateral recess touching the traversing nerve roots.  Mild canal narrowing at multiple levels and mild/moderate foraminal

> narrowing at several levels as described above is also appreciated.  No high-grade foraminal encroachments or canal stenosis at any level is evident.

A.R., pp. 779-780.  Dr. Vermeulen, of Marquette Rehabilitation, discussed this MRI in a letter to Dr. Rose in which he

stated the following:

> [W]e now have the MRI data, which makes it very improbable that we are overlooking an aggressive illness.  With his symptoms of the age-acquired findings seen, the L4-L5 broad based disc bulge and the left foraminal stenosis may in the real life dynamics where he is experiencing pain be relative.  The disc bulge at L1-L2 is a lot less likely to be related to his pain.  No aggressive imaging signs.

A.R., p. 73.  Dr. Vermeuelen indicated that he recommended that LaCosse begin physical

therapy.  A.R., p. 73.

On December 3, 2007, Dr. Vermeulen saw LaCosse again, and indicated that LaCosse's low back pain had been significantly improved with physical therapy.  A.R., p. 238.  Dr. Vermeulen noted that LaCosse was back to walking about two miles a day.  A.R., p. 238.  He stated that LaCosse's neck pain was continuing, however, but that he was not treating LaCosse for that.  A.R., p. 238.  LaCosse saw Dr. Eiben, a neurosurgeon, on December 7, 2007, for a recurrence of neck, shoulder, and arm pain.  A.R., p. 209.  Dr. Eiben ordered a cervical MRI, an EMG of the upper extremities, and an EMG of the right lower extremity.  A.R., p. 210.

The cervical MRI was done on December 26, 2007, and the results were compared with a previous MRI from 2001.  The following impressions were listed on the MRI report:

> 1. Interval progression of degenerative disc space disease at C7-T1 level since the prior examination.  Multifactorial moderate central canal stenosis at this level.
> 2. Decompression of the cervical canal at C3-4 through C7 level with decompressed appearance of the thecal sac.

10

> 3. Broad-based disc/osteophyte complexes at C3-5, C4-5, C5-6 and C6-7 abut and mildly compression the ventrolateral aspects of the cord as described.
> 4. Focal area of signal heterogeneity within the left lateral column at C5-6 level in proper clinic setting may represent area of myelopathy.
> 5. Moderate to advanced multilevel biforaminal stenosis.

A.R., p. 213. On January 17, 2008, Dr. Rovin met with LaCosse and reviewed the cervical MRI results. A.R., p. 222. Dr. Rovin noted that, with regard to LaCosse's arm pain, there were multiple areas of disk degeneration with disk protusion, thecal sac indentation and foraminal narrowing, but he didn't see any role for additional surgery. A.R., p. 222. Dr. Rovin also noted that the MRI revealed degenerative disc disease and degenerative joint disease most pronounced at L4/L5 where there was spinal stenosis to a moderate degree. He stated that there was lesser stenosis at L3/L4, and he recommended a decompressive laminectomy at L3, L4, and L5. A.R., p. 222. Also on January 17, Dr. Eiben reviewed the EMG that was completed, and noted that it showed evidence of left C5/C6 radiculopathy. A.R., pp. 205, 206. He further noted that there was no evidence of active radiculopathy in the right upper or right lower extremity, and that nerve conduction studies were normal. A.R., p. 205. Lastly, Dr. Eiben noted bilateral carpal tunnel syndrome and left ulnar neuropathy at the elbow level. A.R., p. 205.

On February 6, 2008, Dr. Fitch noted that LaCosse has significant pain in his neck and lower back, though the lower back pain was better. A.R., pp. 1329, 1328. The doctor further noted that much of any physical activity bothers LaCosse, and he cannot sit for a long period of time but similarly cannot be on his feet for any length of time. A.R., p. 1329. On February 11, 2008, LaCosse applied for LTD benefits under his policy with Sun Life. A.R., p. 1-4. LaCosse states that he filed an LWOP claim in the spring of 2008, but Sun

Life states that filing of LWOP claims is automatic after an LTD claim is filed.  Doc. No. 34,

p. 3.

On February 20, 2008, a Dr. Koehn engaged in an industrial rehabilitation

psychological evaluation of LaCosse regarding LaCosse's chronic pain.  A.R., pp. 223-226.

Dr. Koehn reached a somewhat ambivalent conclusion:

> He was very illness focused.  Pain is the central complaint.  His
> pain appears high with a strong sensory element to it.  He also
> finds his pain quite unpleasant and tends to suffer it strongly.
> His condition has been associated with profound functional
> impairment.  He is no longer unable to work. . . He does not
> perceive himself as being capable of working and that seems
> invalid.  He may need to apply for social security disability.  The
> prognosis is guarded.

A.R., pp. 225-226.

At an interdisciplinary intake team staffing completed on February 26, 2008, the

following was noted:

> Occupational therapy reports that the patient states that he is
> independent with his self-cares. Vibrations from the lawnmower
> and snowblower tend to increase his pain and symptoms.  Grip
> strength was 36 pounds on the right and 35 pounds on the left.
> His balance is considered impaired.  The patient declined any
> weighted activities due to his neck pain.  Body mechanics are
> rated as poor.  The patient was only able to climb four stairs
> one at a time with heavy use of the rail.  The patient estimates
> that he can sit for up to fifteen minutes at a time, stand for only
> a few minutes and walk for 4-5 minutes at a time.  He did not
> attempt to kneel.  He was only able to get into three-quarters of
> a squat with support.  Overall, the patient moved very slowly
> and guarded.

A.R., p. 227.

On March 17, 2008, LaCosse was seen by Dr. Baldwin of Upper Michigan

Cardiovascular Associates.  A.R., p. 221.  Dr. Baldwin noted that LaCosse had a recent

ultrasound done which revealed predominately triphasic wave forms and major arteries to

the legs. He noted that the overall assessment was that LaCosse did not have significant arterial occlusive disease of the lower extremities, and that the aneurysm was a relatively small size. A.R., p. 221.

In his attending physician statement for LaCosse's LTD benefits application, which was filled out on April 1, 2008, Dr. Fitch stated that LaCosse's diagnoses were spinal stenosis, neck and low back pain, aortic aneurysm, and a 2005 right ankle injury. A.R., p. 24. He stated that the objective findings were "MRI- foraminal stenosis - cervical & lumbar" and "EMG . . . radiculopathy." A.R., p. 24. Subjective findings were stated to be "Neck pain, radiating to L 2nd digit. R arm pain with activity. Back pain radiating to L foot." A.R., p. 24. Dr. Fitch noted that LaCosse's progress was unchanged. A.R., p. 24. Dr. Fitch further noted that LaCosse was able to do the following tasks occasionally: drive, walk, sit, stand, reach above shoulder level, lift 10 pounds, and carry five pounds. A.R., p. 24. He noted that LaCosse was able to do the following negligibly: bend, squat, climb, twist, push, pull, kneel and crawl. A.R., p. 24. He stated that LaCosse was not capable of working at the present time within the above restrictions/limitations due to pain. A.R., p. 24. Dr. Fitch checked the "sedentary capacity" box under the "physical impairment" section, which is labeled with the following: "lifting, carrying, pushing, pulling 10 lbs. occasionally. Mostly sitting, may involve standing or walking for brief periods of time." A.R., p. 24. As LaCosse points out, the "sedentary capacity" box was the highest level of impairment that was listed - the optional boxes were: "no limitation of functional capacity," "medium capacity," "light capacity," "sedentary capacity," and "comments." A.R., p. 24. Dr. Fitch noted that LaCosse had a slight limitation in his cardiac functional capacity. A.R., p. 24. He noted that the limitations would apply longer than 12 weeks. A.R., p. 24.

13

On July 16, 2008, LaCosse met with Dr. Peimer, an orthopaedic surgeon, who noted that LaCosse had evidence of bilateral carpal tunnel compression and electrodiagnostic evidence of left ulnar nerve compression.  A.R., p. 1320.  On August 6, 2008, LaCosse met with Dr. Fitch to discuss his possible upcoming neck, back, and arm procedures.  A.R., p. 1090.  Dr. Fitch noted that LaCosse is currently "really extremely incapacitated as to what he can do."  A.R., p. 1090.

On August 20, 2008, LaCosse had a carpal tunnel release and an ulnar nerve decompression procedures performed on him.  A.R., pp. 1285-1287.  On October 27, 2008, he had an aortic ultrasound, where it was found that his aortic aneurysm had increased in size and now appeared to extend into the iliac arteries.  A.R., p. 390.  On December 3, 2008, a decompressive lumbar laminectomy was performed.  A.R., p. 1124.  A finding of severe lumbar spinal stenosis was noted.  A.R., p. 1124.  Following the procedure, LaCosse had an episode of proximal leg weakness, that was theorized as being an ischemic event, and which improved over time before his discharge.  A.R., p. 1130.  On December 22, 2008, an electromyogram (EMG) was performed, and Dr. Eiben noted the following conclusions: "This is an abnormal study. . . Major level of involvement is at the L4-5 and S1 level on the left and the L5-S1 level on the right.  There is minimal denervation and so his present clinical situation would be expected to improve unless some of the weakness is due to spinal cord involvement."  A.R., p. 882.

As part of his recovery from his lumbar laminectomy, LaCosse took part in physical therapy beginning in January of 2009 and continuing through April of 2009.  A.R., pp. 919-921, 931-937.  LaCosse had a follow up visit with Dr. Rovin on January 20, 2009, at which time it was noted that he could ambulate with a walker, and also that the left lower extremity

14

recovery was slower than the right. A.R., p. 863. On January 21, 2009, Dr. Fitch noted that LaCosse was only able use a walker for a short distance and was in continuous pain. A.R., p. 890.

On March 9, 2009, Dr. Fitch filled out another attending physician's statement for LaCosse's LTD file. A.R., pp. 1036-1038. He did not list any objective findings, and listed subjective findings as leg weakness, swelling and pain. A.R., p. 1036. He remarked that LaCosse's progress was unchanged, and underneath stated "using wheelchair primarily." A.R., p. 1036. He stated that LaCosse could not stand/walk or drive, and could sit for 1-3 hours. A.R., p. 1036. Dr. Fitch checked boxes indicating that LaCosse could not do any of the following: bend, squat, climb, twist body, push, pull, balance, kneel, crawl, grasp, or reach. A.R., p. 1037. He stated that the most that LaCosse could lift was 5 pounds. A.R., p. 1037. He stated that LaCosse could not work, and checked the box labeled "Severe limitation of functional capacity; incapable of minimum (sedentary) activity." A.R., p. 1037. He also checked boxes indicating that LaCosse was incapable of performing another occupation on a full or part-time basis. A.R., p. 1038.

LaCosse was awarded Social Security Disability benefits in 2009. A.R., pp. 561-567. It was found that he had become disabled on August 3, 2007. A.R., p. 561. The Social Security award letter did not contain an explanation of how the Social Security Administration found LaCosse to be disabled.

*File Reviews*

Elizabeth McLellan, MSN, MPH, completed a file review for Sun Life on September 6, 2007. A.R., p. 61. It appears that McLellan reviewed office visit notes from June 2007 through August 2007. A.R., p. 61. McLellan made the following observations:

15

> The AP statement notes complaints of neck, arm, back and leg pain with numbness but the OV notes from 6/19/07 do not reflect these comments. The AP suggests that he cannot work as he needs to avoid all exertion and stress yet there is not any information in the record that would support these specific R&L's and nor is there any other information that would indicate limited work capacity. There are not any diagnostic tests or detailed physical exam findings that would support functional impairment. Close to when he went OOW it appears that he had constipation, which is not usually a factor that would result in any sense of prolonged limited work capacity. Support for never being able to RTW is not evident. And thus further detailed information will be necessary for consideration.

A.R., p. 61.

McLellan reviewed LaCosse's record a second time on November 9, 2007. A.R., p. 60. McLellan noted that additional medical information had been received, but that much of it was unable to be deciphered due to poor copy quality. A.R., p. 60. McLellan indicated that the information from 2002 and 2003 that was received did not relate to the out of work period, and then noted findings from the 10/26/07 office visit note. A.R., p. 60. McLellan then stated the following:

> The most recent OV note does not reflect information that would warrant limited work capacity. In addition there continues to be a lack of medical information that would explain why the EE did cease work on 8/07. The AP indicates that the EE should be on a diet but there is not a current weight; nor are there any physical clinical findings that would suggest support for functional impairment. All of the past information in 2002 and 2003 although does provide information about his physical state at that time, he did return work and thus does not relate to this current OOW period as of 8/4/07.

A.R., p. 60.

On December 3, 2007, Bethany Washburn, RN, completed a file review for Sun Life on LaCosse. Washburn stated the following:

16

> Review of newly submitted data appears to be primarily duplicate information but indicates that the clmt has a history of Dyslipidemia, hypertension, coronary artery disease, spinal stenosis and abdominal aortic aneurysm dating back several years . . . Clmt ha[s] a history of the above conditions without significant change as of 8/3/07.  It appears there was a change in the clmt's job and not his medical conditions.  No change in opinion from prior reviews.  Would consider Plan B as data does not support decreased function.

A.R., pp. 58-59.

Dr. George DiDonna, a cardiology consultant to Sun Life, reviewed LaCosse's file on December 18, 2007.  A.R., p. 66.  Dr. DiDonna indicated the following:

> Mr. LaCosse suffers with Obesity and hypertension.  He has a history of cervical radiculopathy and a small aortic aneurysm which is being followed for increase in size.
>
> There is no evidence on file of a myocardial infarction, angina, congestive heart failure, or cardiac arrhythmias.  There is evidence of an exercise test during which he attained nearly 8 METs in 2002 which would be compatible with sustained Light physical demand activity according to the U.S. Dept. of Labor D.O.T.
>
> While Dr. Fitch says he has difficulty walking there is no description of any neurological exam or any testing to determine if there was any neurological cause for such a problem and to what degree it affected him.
>
> His blood pressure if controlled for the most part in the records and is not dangerously elevated even after the exercise test.  There is no medical record documentation of severe hypertension at work or ER visits during work.
>
> He has risk factors which could cause him to have an increased chance of a myocardial infarction or a CVA.  Thes[e] are hypertension, obesity and hyperlipidemia.  These are mainly risk factors for CAD.  There is no acute MI risk indicators on file such as an HS-CRP or other inflammatory indicators of acute MI.  He has not had symptoms of increasing chest pain due to angina or CAD according to the reports.  He has not had any TIAs according to the reports.

17

A.R., p. 66.  Dr. DiDonna then stated the following conclusions:

> I do not see any indication of a change in functional capacity [as of August 3, 2007] ... since his complaints related to abdominal pain and constipation and there were no acute GI problems found. . . [T]he testing results do not match any significant functional impairment. . . There is no indication that he was suffering from accelerated hypertension or cardiac symptoms that would have prevented him from his usual physical duties. . . [T]here is no reason he would not be able to perform sustained sedentary type physical demand activity. . . I do not see any reason why he could not travel from a cardiac standpoint.  In addition there is no impairing muscoskeletal condition that is impairing him from travel at this time.

A.R., pp. 66-67.

Susan McCormack, RN, reviewed LaCosse's file for Sun Life on July 18, 2008.  A.R., pp. 272-273.  McCormack stated the following:

> The available medical information does not provide evidence from DOD to support a change in his condition that would prevent him from performing lifting up to 20lbs occasionally and 10lbs frequently or prolonged stand/sit/walk/drive.  1. Lumbar stensosis: A lumbar MRI on 10/30/07 noted there were no high grade foraminal encroachment or canal stenosis at any level.  He has evidence of degenerative disc disease, however, no evidence of herniated discs.  RE abdominal aneurysm: He has annual followups and there was no evidence of a change in the status. . . He reported benefit from PT on 12/3/07 and MD noted normal range of motion of lumbar, hip and cervical spine without pain.  An EMG/NCV on 1/17/08 showed evidence of carpal tunnel syndrome, mild ulnar neuropathy and evidence of C5-6 left radiculopathy, none to right upper extremity.  It was noted he was walking up to 2 miles/day as of 12/3/07.  He reported to his PCP in 6/07 that his job was going to change and would involve more activity.  This was apparently before he even started doing this job and he was discussing disability with provider. . . He has multiple diagnoses and there is no specific recovery period.  With PT and exercise his pain level could be reduced.  He is taking Motrin for the pain.

A.R., p. 273.

*Sun Life's Initial Denial of LWOP Claim*

Sun Life denied LaCosse's LWOP claim on August 29, 2008.  A.R., pp. 2185-2186. In its denial letter, Sun Life noted McCormark's findings, and then stated that it appeared that the extent of LaCosse's disability would not prevent him from performing the material and substantial duties of any occupation for which he may be reasonably qualified.  A.R., p. 2186.  LaCosse filed an appeal request of the LWOP claim denial on December 8, 2008, and included additional medical records at this time.  A.R., p. 2046.

*Sun Life's Initial Denial of LTD Benefits*

Sun Life denied LaCosse's claim for LTD benefits on September 16, 2008.  A.R., pp. 281-285.  The denial letter noted the vocational rehabilitation consultant's finding that LaCosse's job, as performed with EMP, was not commensurate with the way the occupation is typically performed in the national economy, in that it required the need to lift and/or move up to 25 pounds occasionally.  A.R., p. 283.  The letter further noted:

> Reviewed records from Dr. Fitch, PCP, Dr. Lewis, Dr. Vermuelen, rehab, Dr. Eiben, rehab, Dr. Rovin, neurosurgeon, Dr. Koehn, psychologist, Dr. Kentala, specialty unknown & Dr. Baldwin, vascular specialist for the time period from 5/07-5/08. APS is dated 4/1/08 from Dr. Fitch and based on last office visit of 2/6/08.
>
> Our medical consultant advised us in part the available medical information does not provide evidence from date of disability to support a change in his condition that would prevent him from lifting up to 20lbs occasionally and 10lbs frequently or prolonged stand/sit/walk/drive.  Regarding Lumbar stenosis: A lumbar MRI on 10/30/07 noted there was no high grade foraminal encroachment or canal stenosis @ any level.  He has evidence of degenerative disc disease, however, no evidence of herniated discs.  Regarding abdominal aneurysm: He has annual follow-ups and there was is no evidence of a change in the status.  He has no evidence of vascular disease in his lower extremities per the Doppler ultrasound of 1/18/08.  Regarding hypertension: He had a normal cardiolite stress test.  Blood pressure ranges were from 140s-160s systolic and 70-90 diastolic and MD was adjusting his medications.

He reported benefit from physical therapy on 12/3/07 and medical doctor noted normal range of motion of lumbar, hip and cervical spine without any pain. An EMG/NCV on 1/17/08 showed evidence of carpal tunnel syndrome, mild ulnar neuropathy and evidence of C5-6 radiculopathy, none to right upper extremity. It was noted he was walking up to 2 miles/day as of 12/3/07. There were reports that he did not attend physical therapy as suggested by Dr. Vermuelen in 11/07. He has had recommendations by rehabilitation team to get into cardiac rehabilitation program as of 2/08, but there is no evidence this has happened. He has multiple diagnoses and there is no specific recovery period. With physical therapy and exercise his pain level could be reduced. He is taking Motrin for the pain. We have medical records up through 5/08 and it appears all records to date have been obtained.

Based on the information in the claim file to date (consisting of all available medical information and occupational information), we are unable to substantiate a total disability or partial disability claim with respect to your spinal stenosis, neck & low back pain, and aortic aneurysm.

A.R., p. 284. The letter gave instructions on how to appeal Sun Life's determination. LaCosse filed an appeal request on December 8, 2008, with which he submitted additional medical records. A.R., p. 287.

*LWOP Additional Information Form*

On February 12, 2009, LaCosse filled out a packet regarding his LWOP claim. A.R., pp. 2019-2024. When asked to describe his present medical condition, he stated that he had pain in his legs, arms, and neck, and nerve numbness in his legs and hands. A.R., p. 2019. He also noted that he currently had rehab three times a week and blood tests twice a week for a blood clot in his leg. A.R., p. 2019. He noted that he had a high school education [A.R., p. 2021], and stated that he stopped working because he couldn't do the job des[criptions]. A.R., p. 2022. He noted that he did not plan to return to work because "[o]n August 8th 2008 Dr. Fitch said I will never pass a job physical." A.R., p. 2023.

*Additional File Reviews*

During the appeal of LaCosse's LTD benefits, Wendy Haering, PA-C, reviewed the records received at the end of 2008, but her conclusions appear to simply be summaries of medical records without a definitive conclusion about LaCosse's disability. A.R., pp. 2029-2031. Sun Life also arranged for Dr. James Lambur, a board certified orthopedic specialist, to complete an independent medical assessment. A.R., p. 579. The assessment, which was completed on August 21, 2009, was, like the others completed for Sun Life, based on a file review. A.R., p. 568. Dr. Lambur made the following conclusions:

> Mr. John F. LaCosse, Sr. is a 60 year old former senior purchasing agent for Engineered Machine Products, Inc. Mr. LaCosse's last day worked was 8/4/07 at which time the claimant had complaints of cervical and lumbar discomfort coupled with co morbid states of hyperlipidemia, obesity and possible carpal tunnel syndrome. The claimant's pathological state was progressive and degenerative, historically being cared for as early as 2002. Progressive musculoskeletal complaints due to chronic, long standing obesity with degenerative disc disease of the lumbar spine led to persistent complaints of low back discomfort. Occupation is more clerical and sedentary and does not fall into the category of moderate or heavy work load. While the claimant did ultimately undergo hemilaminectomy, 3-4, 4-5, there was no dramatic evidence of lower extremity radiculopathy, in fact, electromyog[r]aphic studies failed to reveal evidence of lower extremity neurological deficit of any significance. The claimant was being maintained fairly well for his activities of daily living with Motrin, an anti-inflammatory agent, and was taking no narcotics. Multiple references by the claimant's own admission of making an effort to seek disability are evident in the record with apparent acquiescence by attending physicians, based merely on claimant's complaints rather than actual functional limitations.
>
> There is, in the opinion of this reviewer, no significant functional impairment from 8/4/07 through 2/8/08, nor is there significant impairment of functional ability to warrant absence from the work force. It is reasonable to support post surgical off work status from 8/20/08 thru 9/20/08 for recovery from Carpal Tunnel surgery. It is also reasonable to provide off work status

21

12/3/08 (laminectomy) thru 3/1/09 allowing a reasonable time for recovery.
...

There is no condition evident on record review that would be deemed to cause significant functional impairment throughout and beyond the elimination period of 8/4/07 through 2/8/08. While it is identified that obesity and complaints of chronic back pain were present, coupled with chronic hypertension and hyperlipidemia, there is no reliable evidence that worsening of any of the above conditions spontaneously contributed to the fact of the claimant being unable to continue his current level of activity and his ongoing occupational demands.

Available medical proof does not support significant change being evident in Mr. LaCosse's functional ability due to his chronic complaints of back pain, neck pain or any other condition when he stopped working on 8/4/07.

The available medical evidence does not prove nor substantiate a level of impairment that would interfere with functional ability as described by Dr. Fitch in his Physician's Statement of 4/1/08.

Reasonable restrictions imposed on Mr. LaCosse, in light of physical compromise due to obesity and chronic complaints of low back pain would have restricted ability to life from floor to waist not to exceed 20 pounds and would preclude prolonged periods of standing and/or ambulation in excess of one hour without allowing for position change, e.g., cannot walk for more than 60 minutes at a time or more than 3 hours per day due to complaints of low back pain and should not [lift] more than 20 pounds due to complaints of low back pain and mild to moderate disc degenerative change, chronic in nature. There is no objective or solid evidence to indicate any change in status, such as improvement or regression as to oppose the observation by this reviewer of an ongoing status quo.

There is no discernible medical reason in the record review why Mr. LaCosse should not have been able to perform full time sedentary light work activity at the end of the elimination period of 2/8/08.

A.R., pp. 573-574.

*Sun Life's Final Denial of LTD Benefits*

22

On September 2, 2009, Sun Life denied LaCosse's appeal of their initial LTD benefits denial. A.R., pp. 576-581. The letter noted that Sun Life had received a copy of LaCosse's Social Security Disability (SSD) award letter. A.R., p. 579. The appeal denial letter stated in part:

> Please understand that the Social Security Administration (SSA) is a federal government agency which makes its disability determinations based on its own criteria. Sun Life is a private insurer. The decisions of one entity are not binding on the other, and each insurer makes its claim decisions independently of the other. Accordingly, Mr. LaCosse does not necessarily or automatically qualify for Sun Life LTD benefits just because he has been awarded SSD benefits from the SSA. Sun Life must make an independent determination based on the available proof as applied to the terms of the applicable Sun Life policy.

A.R., p. 579.

The appeal denial letter noted several of the conclusions from Dr. Lambur's review, and stated the following after those conclusions were listed:

> As part of the appeal review, I also contacted Greg Bekes, the Human Resources Director at Engineered Machine Products. Mr. Bekes confirmed that Mr. LaCosse had been employed as a Sr. Buyer from May 2002 until he stopped working in early August 2007. Mr. LaCosse's specific job duties had been limited for some time because he was working on special projects, but he was continuously employed as a Sr. Buyer in the purchasing department. Therefore, it appears that the material and substantial duties of Mr. LaCosse's occupation, as described by Bruce Hoffman above, were appropriately utilized in the original claim assessment.
>
> After reviewing Mr. LaCosse's entire file, including the results of Dr. Lambur's assessment, we do not have any satisfactory proof that Mr. LaCosse was so functionally impaired by neck pain, back pain or any other injury or sickness that he was unable to perform the material and substantial duties of his own occupation throughout and beyond the elimination period. Therefore, the denial of his claim was correct and we affirm that determination.

23

A.R., p. 581.

At this point, LaCosse had exhausted his administrative remedies with regard to his LTD benefits policy. A.R., p. 581. He subsequently brought this suit. Doc. No. 1.

*Sun Life's Final Denial of LWOP Claim*

On November 5, 2009, Sun Life denied LaCosse's appeal of their initial denial of his LWOP disability claim. A.R., pp. 1831-1835. As with the LTD benefits appeal denial, Sun Life stated that the submitted evidence did not support that LaCosse was Totally Disabled and unable to perform the Material and Substantial Duties of Any Occupation at the time he stopped working on August 4, 2007. A.R., p. 1831. Sun Life again quoted from Dr. Lambur's findings, and then stated their finding that LaCosse is capable of "performing the duties of at least sedentary work." A.R., p. 1834. At this point, LaCosse had exhausted his administrative remedies with regard to his LWOP claim. A.R., p. 1835. He subsequently brought this suit, which was initially filed as a separate action but was later consolidated with his LTD benefits suit. Doc. No. 22.

II. STANDARD OF REVIEW

ERISA provides for the review by a district court of a denial of benefits by a plan administrator. 29 U.S.C. § 1132(a)(1)(B) provides:

> A civil action may be brought -
> (1) by a participant or beneficiary - . . .
> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan; . . .

29 U.S.C. § 1132(a)(1)(B). "An employee may challenge a benefit eligibility determination under 29 U.S.C. § 1132(a)(1)(B)." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996).

A plan administrator's denial of benefits is subject to *de novo* review unless the benefit plan "grant[s] 'the administrator or fiduciary discretionary authority to determine eligibility for benefits." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008), *quoting Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In this case, the parties agree that the *de novo* standard of review should apply.

When engaging in a *de novo* review of a denial of ERISA benefits, the Court's role is "to determine whether the administrator . . . made the correct decision." *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 808-809 (6th Cir. 2002) (citation omitted). No deference or presumption of correctness is given to the administrator's decision. *Id.* at 809. Looking only at the administrative record, the Court "must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Id.*

III. ANALYSIS OF LTD BENEFITS CLAIM

*a. Own Occupation*

LaCosse's claims turn on whether he met the definition of "Totally Disabled" under the LTD benefits policy and the LWOP policy. An initial issue to resolve when analyzing LaCosse's LTD benefits claim is what definition, and associated restrictions, of "Material and Substantial Duties" of LaCosse's "Own Occupation" to use: the one listed by EMP or the one found in Hoffman's report. In its response brief, Sun Life argues that Hoffman's report, with its description of the duties of a Purchasing Agent, is the correct definition of "Own Occupation" in this case. Doc. No. 20, pp. 10-16. In his reply, LaCosse does not counter this argument, instead stating that he cannot perform the "Material and Substantial Duties" of his "Own Occupation" as described by EMP *and* as described in Hoffman's

report. Doc. No. 21, p. 5. As LaCosse has not raised the argument that the use of Hoffman's definition of the "Material and Substantial Duties" of LaCosse's "Own Occupation" is improper, the Court will assume that the definition put forth by Hoffman is the appropriate one.

*b. SSA determination*

LaCosse argues that Sun Life failed to properly consider the approval of his SSA claim. Doc. No. 19, p. 15. He states that the paragraph found in the appeal denial letter from Sun Life was insufficient to explain why its decision differed from that of the SSA administrative law judge. Doc. No. 19, pp. 15-16. The Sixth Circuit has found that, "[i]f the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of disability; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability," this should weigh in favor of an arbitrary and capricious finding. *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 446 (6th Cir. 2009), *citing Bennett v. Kemper Nat'l Servs.*, 514 F.3d 547, 554 (6th Cir. 2008).

As Sun Life points out, the administrative record does not contain any factual findings of the SSA administrative law judge. Instead, it only includes the letter where the SSA explained that it was awarding benefits to LaCosse based on a determination that he became disabled beginning on August 3, 2007. While LaCosse includes a paragraph in his brief that was allegedly part of the administrative law judge's findings, this Court may not consider this paragraph as evidence in reaching its decision, since it is not a part of the administrative record. *See Perry v. Simplicity Engineering*, 900 F.2d 963 (6th Cir. 1990) ("The *de novo* standard of review . .. does not . . . permit the consideration of evidence not

presented to the administrator."). LaCosse's statement in his reply brief that he mailed the administrative law judge's findings to Sun Life and is unsure why they were not made part of the administrative record [Doc. No. 21, p. 4] does not change this rule. This is especially true given the fact that LaCosse had the opportunity to contest the administrative record and, despite that opportunity, did not mention this issue until filing his reply brief. *See* Case Management Order, Doc. No. 7, pp. 1-3.

Given the fact that Sun Life only received the conclusory SSD award letter and did not receive any explanation for the basis of the SSA's decision, Sun Life's explanation of why it was taking a different position than the SSA was certainly sufficient. *See Smith v. Life Insurance Co. of North America*, 2011 WL 766071 (S.D. Ohio 2011) ("the fact that [the insurance company] did not specifically refer to the SSA decision in its denial letter holds less weight, particularly because the SSA award of benefits contained no explanation for the award of benefits"). The Court is similarly unable to give much weight to the SSD award in its *de novo* review, given the lack of explanation for the award within the administrative record.

### c. Nurses

LaCosse notes that two of Sun Life's file reviews were completed by nurses, "and that must be taken in consideration when assessing their credibility." Doc. No. 19, p. 12. However, as Sun Life notes, "th[e Sixth Circuit] has never held that a file review by a nurse is an insufficient form of review." *Iley v. Metropolitan Life Ins. Co.*, 261 Fed. Appx. 860, 864 (6th Cir. 2008). Although *Iley* was a case that applied the arbitrary and capricious standard, a review of the relevant case law indicates that the statement made in *Iley* applies in the context of both arbitrary and capricious and *de novo* cases. Furthermore, LaCosse

provides no explanation of what evidence in the record could be appreciated by a doctor but not by a nurse. *See McCulloch v. Metropolitan Life Ins. Co.*, 2006 WL 897574 (E.D. Mich. 2006). The fact that two of the file reviews were conducted by nurses does not, therefore, weigh in LaCosse's favor.

### d. Conflicts of Interest

LaCosse notes a potential structural conflict of interest in this case, based on the fact that Sun Life was both the claim decision maker and also the payor of the claim. Doc. No. 19, p. 16. LaCosse supports this assertion with the fact that Sun Life's denial decision was based on the file reviews of physicians who Sun Life selected and paid to assess his claim. Doc. No. 19, p. 16. Sun Life, in response, notes that "treating physicians may be motivated to give a biased opinion in favor of their established patients[.]" Doc. No. 20, p. 4.

As the Supreme Court has acknowledged, "if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of disabled." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003). Clearly, the potential for bias can run both ways. Furthermore, LaCosse has not shown any evidence that the file review physicians' opinions were improperly affected by their potential bias. Therefore, the Court does not find the potential for file reviewer bias to be a factor that weighs in LaCosse's favor. *See Kalish*, 419 F.3d at 508; *see also Bishop v. Sun Life Assurance Co. of Canada*, 2007 WL 141051 (E.D. Ky. 2007).

To the extent that LaCosse argues that Sun Life was operating under a structural conflict of interest as both the decision maker and the payor, this argument is irrelevant, as this case is being conducted under the *de novo* standard review. Sun Life's decision to deny benefits is therefore not entitled to any deference. *Price v. Hartford Life and Acc. Ins.*

28

*Co.*, 746 F.Supp.2d 860, 867 (E.D. Mich. 2010) ("If the standard of review is *de novo*, then the significance of the administrator's conflict of interest evaporates[]"); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) ("*if a benefit plan gives discretion* to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion") (emphasis added) (internal quotations omitted).

### e. Treating Physicians vs. File Reviews

In arguing that the opinions of his treating physicians should have been given more weight than those of Sun Life's file reviewers, LaCosse states that "ordinarily the opinions of treating physicians who have actually examined plaintiff will outweigh the opinions to the contrary of physicians who have merely performed a one-time 'IME' or undertaken a 'cold' review of the medical file." Doc. No. 19, p. 13.  To the extent he is arguing that treating physicians are entitled to deference over the opinions of file reviewing physicians, LaCosse's assertion is an inaccurate statement of the law.  The Supreme Court has held that, in the context of ERISA cases, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  Thus, plan administrators are not under any obligation to give greater weight to the opinions of treating physicians than to other medical professionals, including those whose opinions are based on a file review.

As LaCosse himself points out, the Sixth Circuit has stated that it "f[ound] nothing inherently objectionable about a file review by a qualified physician in the context of a

benefits determination." *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 296 (6th Cir. 2005). Rather, "[w]hether a doctor has physically examined the claimant is ... one factor that [the court] may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician." *Kalish v. Liberty Mutual/Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 508 (6th Cir. 2005), *citing Calvert*, 409 F.3d at 295. Therefore, although treating physicians are not afforded a presumption of deference, it is appropriate for this Court to consider whether the doctor or medical professional physically examined the plaintiff as a factor in determining the correct weight to give to his or her opinion.

In considering the weight to give a file reviewer's opinion, the Court must also be mindful of whether that opinion includes credibility determinations. The Sixth Circuit has noted that, "[w]here . . . the conclusions from that [file] review include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate." *Calvert*, 409 F.3d at 297, n. 6. In this case, the file reviews contain multiple credibility determinations. Washburn, for example, states that there appears to be a change in LaCosse's job requirements, not his medical condition. A.R., p. 59. This statement goes beyond looking for objective evidence of a disability to making a credibility determination as to why LaCosse filed a claim for LTD benefits. Similarly, Dr. Lambur states that LaCosse's "effort[s] to seek disability" are supported "with apparent acquiescence by attending physicians, based merely on claimant's complaints rather than actual functional limitations." A.R., p. 573. Given the fact that the file reviewers did not actually examine LaCosse, the Court views such statements with skepticism and finds that they are entitled to less weight.

*f. De Novo Review of LTD Benefits Denial*

LaCosse cites a Sixth Circuit opinion, *Spangler v. Lockheed Martin Energy Systems, Inc.*, 313 F.3d 356 (6th Cir. 2002), for the proposition that a record cannot be "cherry picked" by file reviewers to select evidence that supports a benefits denial and to ignore evidence that does not.  Doc. No. 19, p. 9.  *Spangler* does not support that proposition, as it involved a situation where *the insurance company* sent an incomplete file with select records to its vocational consultants in an effort to obtain a favorable review.  313 F.3d at 362 (emphasis added).  LaCosse is, however, correct that it is improper for the file reviewers (and, in effect, Sun Life) to arbitrarily refuse to credit LaCosse's reliable evidence.  *Nord*, 538 U.S. at 834.  This Court must therefore, in this *de novo* review, ensure that each doctor's opinion is given the proper weight in accordance with the supporting medical tests and objective findings that underlie that doctor's opinion.  *Crider v. Highmark Life Ins. Co.*, 485 F.Supp.2d 487, 505 (W.D. Mich. 2006).

Sun Life argues that LaCosse's own physician, Dr. Fitch, confirmed that LaCosse was capable of the "Material and Substantial Duties" of his "Own Occupation" as defined in Hoffman's report.  Doc. No. 20, p. 15.  It is true that Dr. Fitch checked the box that stated that LaCosse was capable of sedentary activity on both his August 2007 and April 2008 attending physician statements.  A.R., pp. 24, 1037.  "Sedentary work" is defined by the U.S. Department of Labor as follows:

> Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking of standing for brief periods of time.  Jobs are

31

sedentary if walking and standing are required only occasionally
and all other sedentary criteria are met.

A.R., p. 992.  Sun Life thus attempts to argue that LaCosse's "Own Occupation" was

sedentary, and that Dr. Fitch therefore stated that LaCosse was capable of performing his

"Own Occupation."

A review of LaCosse's "Own Occupation" as defined in Hoffman's report shows fault

in Sun Life's reasoning.  Hoffman describes LaCosse's "Own Occupation" to require "light

physical exertion, which would consist of carrying, pushing, *pulling 20 pounds occasionally*,

*frequently up to 10 pounds*, or negligible weight constantly, and which could also include

*walking or standing frequently*, along with occasional reaching, handling and fingering."

A.R., p. 155 (emphasis added).  LaCosse's "Own Occupation," therefore, differs from

sedentary work, given the requirement to frequently pull 10 pounds, to occasionally pull 20

pounds, and to have the potential to have to frequently walk or stand.  Thus, Dr. Fitch's

attending physician statements do not state that LaCosse was capable of performing his

"Own Occupation."  That conclusion is further bolstered by the fact that Dr. Fitch had the

option of checking the "light capacity" box and chose to check the "sedentary capacity" box

instead.  A.R., pp. 24, 247.

A great deal of the file reviewers' discussion revolves around the fact that there are

no records indicating that LaCosse was seen for back or neck pain around the time that he

stopped working at EMP.  For example, McLellan states that "[t]he AP statement notes

complaints of neck, arm, back and leg pain with numbness but the OV notes from 6/19/07

do not reflect these comments. . . Close to when he went OOW [out of work] it appears that

he had constipation, which is not usually a factor that would result in any sense of prolonged

limited work capacity."  A.R., p. 61.  Similarly, Dr. DiDonna stated: "I do not see any

indication of a change in functional capacity [as of August 3, 2007] . . . since his complaints related to abdominal pain and constipation and there were no acute GI problems found..." A.R., p. 66.  However, the fact that LaCosse was seen for other issues, such as constipation and ear irritation, around the time that he left work at EMP does not foreclose the possibility that he was experiencing pain and was disabled at that time.  Therefore, the Court finds that statements such as these should be accorded little weight.

Similarly, Sun Life points to Dr. Fitch's statements about LaCosse having issues with his job requirements changing and about his desire to take a buy out, to show that Dr. Fitch's opinion about LaCosse's disability should not be given much weight.  While such statements do raise suspicion, it is possible that LaCosse could have desired a buy out and also been disabled under the terms of the policy.  *See DeLisle*, 558 F.3d at 448 (noting that a doctor's treatment notes stating that a patient was fired based on personality issues and job performance does not foreclose the possibility that the patient was nonetheless disabled on the day she was fired).

Even more significantly, the Court finds that Dr. Fitch's opinion regarding LaCosse's disability is supported by sufficient medical tests and objective findings.  Dr. Fitch focuses on LaCosse's back, neck, leg and arm pain as being bases of his disability.  While other chronic conditions are also listed, the Court finds that the most objective evidence is found with regard to those symptoms.

The Court notes the following as objective evidence that tends to support Dr. Fitch's opinions regarding LaCosse's disability.  LaCosse has spinal stenosis, which was diagnosed back in 2002.  This spinal stenosis was serious enough to require a surgery in 2002.  LaCosse received steroid injections for his cervical disc disease in either 2004 or

33

2005.  An MRI was done on October 30, 2007, only a few months after LaCosse stopped work, that indicated the existence of an L-4 broad based disc bulge and foraminal stenosis. Dr. Vermeuelen indicated that this finding could be related to LaCosse's pain.  Another MRI, which was completed on December 26, 2007, noted moderate stenosis that was again serious enough to require surgery at the end of 2008, during which LaCosse's spinal stenosis was found to be severe.    These tests and procedures constitute objective evidence regarding LaCosse's spinal stenosis.

When evidence of those objective tests are combined with LaCosse's treating physicians' observations that he can only climb a few stairs with difficulty and that he has to use a walker or wheelchair, it appears to the Court that sufficient evidence exists to support Dr. Fitch's opinions regarding LaCosse's disability.

The fact that the file reviewers made credibility statements without physically examining LaCosse indicates that those reviewers' opinions should be given less weight. Furthermore, the file reviewers' focus on LaCosse's treatment for various other symptoms around the time he filed for disability is not effective in precluding the possibility that he was disabled.  In addition, sufficient objective evidence exists to support LaCosse's claims of pain and Dr. Fitch's statements about his restrictions and limitations.  Therefore, the Court finds that Dr. Fitch's findings in his attending physician statements are entitled to sufficient weight to warrant a finding that LaCosse was disabled under the terms of the policy and was entitled to LTD benefits from Sun Life.

IV. ANALYSIS OF LWOP CLAIM

In his brief for his motion to have Sun Life's denial of LaCosse's LWOP benefit reversed, LaCosse raises the arguments made above regarding the use of file reviewers,

the "cherry picking" of the record, Sun Life's failure to consider the SSA award determination and the inherent conflict of interest. The Court refers to its discussions above in regard to each of these arguments, with the exception of the argument about the SSA determination. In addition, the Court will conduct a *de novo* review with regard to the LWOP claim below.

### a. SSA Determination

LaCosse argues that Sun Life failed to properly consider the SSA's award to him in its denial of his LWOP claim. Doc. No. 33, p. 20. Unlike its appeal denial letter of LaCosse's LTD benefits claim, Sun Life's appeal denial letter of LaCosse's LWOP claim does not mention the SSA award. As was noted above, the Sixth Circuit has found that, "[i]f the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of disability; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability," this should weigh in favor of an arbitrary and capricious finding. *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 446 (6th Cir. 2009), *citing Bennett v. Kemper Nat'l Servs.*, 514 F.3d 547, 554 (6th Cir. 2008).

As the administrative record does not contain any factual findings of the SSA administrative law judge, LaCosse's inclusion of a paragraph in his brief that was allegedly part of the administrative law judge's findings cannot be considered. *See Perry*, 900 F.2d at 967. Given the fact that the plan administrator had only received the letter stating that the SSA was awarding benefits to LaCosse, without any explanation for the basis of its decision, this Court does not find that Sun Life's failure to explain why its own finding differed is entitled to much weight. *See Smith v. Life Insurance Co. of North America*, 2011

WL 766071 (S.D. Ohio 2011) ("the fact that [the insurance company] did not specifically refer to the SSA decision in its denial letter holds less weight, particularly because the SSA award of benefits contained no explanation for the award of benefits"). This Court is, again, unable to give much weight to the SSA benefits award in its *de novo* review of the LWOP denial, given the lack of explanation for the award within the administrative record.

*b. De Novo Review of LWOP denial*

In its *de novo* review of this LWOP claim denial, this Court must ensure that each doctor's opinion is given the proper weight in accordance with the supporting medical tests and objective findings that underlie that doctor's opinion. *Crider v. Highmark Life Ins. Co.*, 485 F.Supp.2d 487, 505 (W.D. Mich. 2006). Before determining what weight to give, however, the Court must determine if any of the doctors' opinions even support a finding of total disability as it is defined by the LWOP policy.

Under the LWOP policy, a claimant is totally disabled if he is "unable to perform the material and substantial duties of *any* occupation for which he is or becomes reasonably qualified for by education, training or experience." A.R., p. 1768 (emphasis added). In their appeal denial letter, Sun Life noted that this could include sedentary work. A.R., p. 1834. LaCosse does not contest that interpretation of the policy as it applies to him.

LaCosse argues that Dr. Lambur's opinion that he should have been able to perform sedentary light work at the end of the elimination period is in direct contradiction to Dr. Fitch's statement filed in the waiver case. LaCosse then cites pages 1036 through 1038 as consisting of the statement filed in the waiver case. Doc. No. 33, p. 10. Those pages refer to the attending physician statement that Dr. Fitch filled out in April of 2009, when LaCosse's LWOP claim was being appealed. A.R., p. 1038. In that statement, LaCosse

did check the box labeled "Severe limitation of functional capacity; incapable of minimum (sedentary) activity."  A.R., p. 1037.  LaCosse is correct that Dr. Fitch's April 2009 finding is in direct contradiction to Dr. Lambur's finding.  Dr. Fitch did, however, also fill out two earlier attending physician statements.  In the first statement, filled out as part of LaCosse's STD packet on August 1, 2007, Dr. Fitch checked the physical impairment box of "Class 4-Moderate limitation; capable of clerical/administrative (sedentary) work."  A.R., p. 247. Additionally, in his April 2008 statement, Dr. Fitch checked the "sedentary capacity" box. A.R., p. 24.  While LaCosse correctly points out that this was the highest limitation that was listed, the fact that it was not the highest limitation possible on the August 1st physician statement form, and the fact that Dr. Fitch marked LaCosse's status as "unchanged" on April 1st, indicate that Dr. Fitch felt that LaCosse was capable of sedentary activity on April 2008 as well as on the previous August 2007.  In other words, it seems clear that LaCosse can perform the job duties of *some* occupation.

While there is some dispute about whether an LWOP application actually had to be filed, LaCosse alleges that his application was filed in the spring of 2008.  Assuming that this is true, the August 2007 and April 2008 attending physician statements were the only two that Sun Life would have even had available to consider in making its determination. This Court therefore believes that Dr. Fitch's statements do not indicate that LaCosse was "Totally Disabled" for LWOP purposes at the time he left his job and the time he actually filed for LWOP benefits.  Given the lack of support for LaCosse's disability (as defined in the LWOP policy) from LaCosse's own treating physician, the Court concludes that there is insufficient support in the administrative record for a reversal of Sun Life's denial of LaCosse's LWOP claim.

V. RELIEF

In his motion for judgment with regard to the LTD benefits claim, LaCosse requests the following relief: (1) a declaratory judgment; (2) preliminary and permanent injunctions enjoining Sun Life from discontinuing, reducing, limiting or terminating the benefits payable to him; (3) a full and accurate accounting of LaCosse's benefits; (4) an order compelling Sun Life to pay LaCosse the full amount of benefits due to him; (5) disgorgement of any profits or gain Sun Life has obtained and equitable distribution of any profits or gain to LaCosse; and (6) reasonable attorney's fees and costs. Doc. No. 18, p. 2.

In this case, Sun Life only made a determination as to LaCosse's eligibility for LTD benefits as defined during the Elimination Period and for twenty four months afterward, when the relevant inquiry was whether LaCosse was able to perform the Material and Substantial Duties of his Own Occupation. A.R., pp. 1646. After that time period, the relevant inquiry changes to whether LaCosse is able to perform the Material and Substantial Duties of any Gainful Occupation for which he is or becomes reasonably qualified for by education, training or experience. A.R., p. 1646. The Court therefore orders that judgment is entered in favor of LaCosse retroactively for the twenty four month period beginning at the end of the Elimination Period: February 1, 2008 to February 1, 2010. Sun Life will be directed to file a schedule within fourteen days, setting forth for each month in that time period the benefit amount payable to LaCosse. Given the fact that the twenty four month period has ended, injunctive relief is not appropriate in this case. As LaCosse has not shown what profit Sun Life may have obtained as a result of its denial of LTD benefits, and as evidence of any such profit

38

cannot be seen in the administrative record, disgorgement is also an inappropriate remedy.

Finally, the Court finds that attorney fees and costs are not appropriate in this case.  The Sixth Circuit considers the following five factors in determining whether a district court properly awarded attorney fees:

> (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.

*Moon v. Unum Provident Corp.*, 461 F.3d 639, 642 (6th Cir. 2006).  The facts of this case make Sun Life's decision to deny LTD benefits not without some substantial support.  Therefore, the first and fifth factors do not weigh in the favor of granting attorney's fees.  *Cf., Heffernan v. UNUM Life Ins. Co. of America*, 101 Fed. Appx. 99, 109 (6th Cir. 2004) (where the Sixth Circuit found that a plan administrator acted culpably when it ignored *overwhelming* evidence of a claimant's disability) (emphasis added).  LaCosse has not shown any evidence with regard to the second factor.  The Court does not find that there would be a deterrent effect as a result of such an award, and LaCosse did not seek to confer a common benefit or to resolve significant legal questions regarding ERISA.  An award of attorney's fees is therefore inappropriate.

## VI. CONCLUSION

For the reasons stated above, LaCosse's motion for judgment on the administrative record concerning the denial of long term disability benefits [Doc. No. 18] will be GRANTED and his motion for judgment on the administrative record concerning the denial of his life

insurance waiver of premium benefit [Doc. No. 33] will be DENIED.  Correspondingly, Sun Life's motion concerning the denial of long term disability benefits [Doc. No. 20] will be DENIED and its motion concerning the denial of the life insurance waiver of premium benefit [Doc. No. 34] will be GRANTED.

A separate judgment will enter.


Dated: September 12, 2011                         _____/s/ R. Allan Edgar_____
                                                  R. ALLAN EDGAR
                                                  UNITED STATES DISTRICT JUDGE